The parties waived oral argument before the Full Commission. The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Wanda B. Taylor and the briefs before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms and adopts the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing as
 STIPULATIONS
1. The parties entered into a Pre Trial Agreement, which is incorporated into the record.
2. An employer-employee relationship existed between the parties, and the parties were bound by and subject to the provisions of the Workers' Compensation Act.
3. Sun Health GSIA is the carrier on the risk.
4. Plaintiff's date of injury is January 1, 1996.
5. Plaintiff's average weekly wage at the time of her injury was $732.62, yielding a compensation rate of $488.41.
6. The parties entered into a Form 21, Agreement for Compensation, approved by the Industrial Commission on July 8, 1996, accepting liability for a cervical disc and pursuant to which temporary total disability compensation was paid to plaintiff from the date of injury until April 29, 1996.
7. Temporary total disability benefits were reinstated on May 6, 1997, and are continuing to be paid.
 * * * * * * * * * * *
Based upon all of the competent evidence of record, the Full Commission adopts the findings of fact of the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff was a 50-year-old female at the time of the hearing before the deputy commissioner, born July 26, 1948. She is a registered radiology technologist and registered diagnostic medical sonographer. She worked as a radiology technologist from 1968-1994. Plaintiff began employment with defendant-employer as a sonographer in February 1995, and continued in that capacity until May 1996, when she moved to Salisbury with her husband, who relocated his business to Charlotte.
2. Plaintiff sustained an admittedly compensable injury by accident on January 1, 1996, when she developed pain in her left shoulder radiating to her neck. This occurred in the course of her duties as a sonographer when she assisted a patient who became dizzy and fell. She continued working following that incident. Plaintiff alleges she sustained a further injury on January 12, 1996, when she developed excruciating pain in her left arm and bilateral upper extremity numbness after lifting a patient. Plaintiff has not filed a claim for the January 12, 1996, incident, and the employer has never accepted an injury for that date.
3. Plaintiff's prior medical history is notable for various medical problems prior to January 1, 1996 for which she has seen a number of physicians. She treated from 1974-1993 with Dr. William Kellett. Plaintiff noted a history of anemia to Dr. Kellett on April 16, 1994. On January 27, 1975, she reported depression secondary to a stillborn delivery and marital problems. She noted on June 28, 1978, that she was tired and restless after going through a divorce. On August 23, 1978, plaintiff presented with low back pain and tested positive for E-Coli. On May 21, 1986, Dr. Kellett noted symptoms of mood swings, bloating, back pain, and a general feeling of misery. Plaintiff presented on August 17, 1988, complaining of hot flashes, night sweats, insomnia, increasing headaches, anxiety, tachycardia, fatigue, low back pain and a general feeling of ill health. Plaintiff reported an anxiety attack on August 22, 1988. On October 30, 1991, plaintiff complained of back pressure and depression. Dr. Kellett also recorded complaints of menopausal symptoms, night sweats and poor sleep pattern.
4. Plaintiff presented to the Holly Tree Family practice on November 3, 1992, complaining of situational depression. She noted that she had been treated in the past with Prozac.
5. Plaintiff saw Dr. Kevin Tracey, an internist, on July 5, 1994, with symptoms of malaise, fatigue, joint pain, low-grade temperature, facial rash and small joint swelling in the hands. Dr. Tracey suspected lupus.
6. Plaintiff consulted Dr. Harriett Van Hale, a dermatologist, on July 8, 1994. On her initial visit, plaintiff completed a written medical history wherein she reported photosensitivity and skin allergies. Plaintiff described her general health as "poor".
7. Dr. David Ellis saw plaintiff on July 24, 1995, for mood swings and emotional lability. Diagnostic studies revealed that plaintiff had a fibrotic uterus. On November 9, 1995, plaintiff underwent a vaginal hysterectomy. On December 1, 1995, she reported that she was not sleeping well and felt jittery during the day. On December 20, 1995, plaintiff complained of lack of energy and poor sleep. Later the same day, she complained of an irregular heartbeat and weakness.
8. Following her compensable injury on January 1, 1996, plaintiff presented to Dr. Schulhof, a neurosurgeon, for evaluation of left shoulder pain. Diagnostic studies previously obtained indicated plaintiff had degenerative changes of the cervical spine. On February 16, 1996, plaintiff underwent a posterior cervical foraminectomy and disc excision performed by Dr. Schulhof. Post-operatively, plaintiff reported resolution of her left upper extremity symptoms. She reported on March 20, 1996, that her arm and neck had improved considerably. On April 19, 1996, plaintiff complained of a new and different problem (flank pain) unrelated to her neck surgery. She appeared depressed. On May 7, 1996, plaintiff reported that her neck, arm and shoulder symptoms had resolved, except for occasional tingling in the fingers of her left hand. Dr. Schulhof approved plaintiff to return to work with the first two weeks to be half days only and full-time thereafter. He did not assign any specific work restrictions. Dr. Schulhof rated plaintiff with a 5% permanent partial disability of the back.
9. In May 1996, plaintiff terminated her employment with defendant-employer and relocated to Salisbury in June 1996. She began performing sonography on an as-needed basis with local medical facilities. As a sonographer, plaintiff spent 90% of her time performing examinations. She worked eight to ten hours per day. Sonography is performed using a probe, which is moved slowly over the patent's body. Plaintiff held the probe in her right hand and used her left hand to operate the monitor. An average examination took 45 minutes to one hour, although some examinations took as much as two hours. To use the probe, plaintiff had to hold her right arm outstretched at shoulder level and constantly rotate her arm from the shoulder.
10. In October 1996, plaintiff applied for a full-time sonographer position at Rowan Regional Medical Center. As part of the application process, plaintiff underwent a pre-employment physical examination, which required her to complete a health questionnaire concerning her physical condition. The questionnaire listed 53 medical problems, including allergies, swollen or painful joints, depression, headache, and anemia, all of which plaintiff denied. This form accurately described plaintiff's physical condition as of October 28, 1996.
11. Plaintiff was subsequently employed by Rowan Regional Medical Center, where she worked full-time 50-60 hours per week. She worked 10:00 a.m. to 6:00 p.m. daily and every fourth weekend. Plaintiff was on-call every fourth night. She could not leave until all of her patients were examined. When plaintiff began working full-time, she developed a number of problems including flu-like symptoms, fever, sore throat, fatigue, pain, headaches, numbness and swollen glands. The longer plaintiff worked at Rowan Regional Medical Center, the worse her condition became.
12. Plaintiff consulted Dr. Kenneth Lassiter, a neurosurgeon, on September 16, 1996 on referral from Dr. Schulhof for evaluation of right shoulder pain, numbness and tingling. A myelogram/CT scan revealed a left-herniated disc at C6-7 with nerve impingement. On January 10, 1997, plaintiff reported low back pain, which had not been reported when Dr. Lassiter first saw her in September 1996. On May 6, 1997, Dr. Lassiter performed an anterior cervical diskectomy and fusion, C5-7. On June 16, 1997, plaintiff reported that she was doing well, with minimal complaints of left hip, back and leg pain. She had a normal neurological examination. Plaintiff reported on July 28, 1997, that she was still feeling well with the same minimal complaints. Dr. Lassiter approved her to return to work on a half-day schedule, with a 20 pound weight restriction. Dr. Lassiter next saw plaintiff on September 26, 1997, at which time she had a variety of low-grade pain complaints, which were unrelated to her neck injury. Plaintiff had a normal neck area examination on December 12, 1997 with complaints of back, hip and leg pain. Plaintiff was rated with a 10% permanent partial disability of the back, which included the 5% rating assigned by Dr. Schulhof. Plaintiff reached maximum medical improvement as of December 12, 1997, and was released to return to work without restrictions.
13. Plaintiff reported to Dr. Lassiter on December 12, 1997, that she had been diagnosed with fibromyalgia and chronic fatigue syndrome. Dr. Lassiter was of the opinion that these problems were not related to plaintiff's work injury. Dr. Lassiter did not know of any mechanism whereby a neck injury could produce diffuse complaints in the low back and lower extremities.
14. Plaintiff had consulted Dr. Gordon Senter, a rheumatologist, on February 4, 1997, for pain and swelling. Dr. Senter documented a family history, which included plaintiff's mother having aches and pains, osteoarthritis and spastic bowel. Plaintiff had a 40-year-old brother who developed aches and pains and swollen hands as well. Plaintiff's symptoms did not suggest fibromyalgia to Dr. Senter. He suspected a low-grade inflammatory process. On July 1, 1997, plaintiff complained to Dr. Senter of aches and pains and inability to sleep. Dr. Senter noted that plaintiff had been working more than 40 hours each week and going in up to two to three times during the night and on weekends when she was on call. Plaintiff advised Dr. Senter she had worked as many as twelve days in a row without a day off.
15. Plaintiff was seen and evaluated by Dr. T. Kern Carlton, a specialist in rehabilitation medicine, on October 23, 1997. Plaintiff had fluid speech and good recall of past events. She had 16/18 positive tender points for fibromyalgia. Dr. Carlton diagnosed fibromyalgia and chronic fatigue syndrome; however, he was of the opinion that these conditions were not a result of plaintiff's work injury.
16. Plaintiff consulted Dr. Charles Lapp on August 20, 1997. Dr. Lapp obtained a litany of symptoms from plaintiff. Dr. Lapp never reviewed plaintiff's records for medical treatment received prior to January 1, 1996. He relied exclusively on plaintiff's history and the history of the examining physician on January 30, 1996, that plaintiff had "no previous medical problems or musculoskeletal problems." Plaintiff never informed Dr. Lapp of her extensive past medical problems. The medical history plaintiff gave Dr. Lapp is against the greater weight of the evidence and will not support the opinions rendered by him. The greater weight of the evidence established that plaintiff had experienced most of the symptoms she reported to Dr. Lapp on August 20, 1997, prior to her injury on January 1, 1996. Her complaints included musculoskeletal problems.
17. Dr. Lapp understood that plaintiff's symptoms had been continuous since January 1, 1996. He acknowledged that an accurate history is critical in determining the origin of fibromyalgia/chronic fatigue syndrome. Dr. Lapp was of the opinion that there was a temporal relationship between plaintiff's injury and her onset of symptoms of fibromyalgia and chronic fatigue syndrome. Plaintiff's voluminous medical records, including the medical history she completed on October 28, 1996, indicate the history relied upon by Dr. Lapp was inaccurate. The greater weight of the evidence indicates that plaintiff did not have persistent symptoms dating to her injury on January 1, 1996. Dr. Schulhof noted good improvement in plaintiff's condition following surgery on February 16, 1996.
18. Defendant had plaintiff's case reviewed by Dr. John Babich, who is board-certified in rheumatology and internal medicine. Dr. Babich has expertise in autoimmune diseases. He is the only physician to review all of plaintiff's medical records, including those for treatment prior to January 1, 1996. As part of his medical practice, Dr. Babich diagnoses and treats fibromyalgia and chronic fatigue syndrome.
19. According to Dr. Babich and Dr. Lapp, a complete medical history is essential to evaluate and treat fibromyalgia and chronic fatigue syndrome. Plaintiff's medical records documented numerous symptoms of an affective-spectrum disorder prior to her injury on January 1, 1996, including stress-related events, tachycardia, hot flashes, night sweats, fatigue, insomnia, joint pain and swelling, headaches, PMS, vasomotor instability and back pain. Dr. Babich was of the opinion that plaintiff met the diagnostic criteria for fibromyalgia/chronic fatigue syndrome prior to her work injury.
20. The pattern of fibromyalgia/chronic fatigue syndrome is that patients most commonly get progressively worse following development of the disorder. The health questionnaire completed by plaintiff on October 28, 1996, documented that her condition did not progressively worsen following her injury and that she did not experience persistent symptoms related to fibromyalgia and chronic fatigue syndrome. Dr. Babich is of the opinion that plaintiff's fibromyalgia and chronic fatigue syndrome are not proximately related to her work injury, due to the documented improvement in her general condition following treatment by Dr. Schulhof. Since Dr. Babich is the only physician to review all of plaintiff's medical records and, thereby, obtain a complete and accurate history for her, his opinion is given greater weight than the opinion of Dr. Lapp.
21. Dr. Babich concluded that plaintiff's long working hours at Rowan Regional Medical Center, which resulted in sleep disruption over an extended period of time, aggravated plaintiff's pre-existing fibromyalgia/chronic fatigue syndrome. He further noted that, as documented in the medical literature, repetitive activity (trauma) from performing the duties of a sonographer could give rise to fibromyalgia. Plaintiff developed flu-like symptoms, fever, sore throat, fatigue, pain, headaches, numbness and swollen glands after she began working 50-60 hours per week as a sonographer in November 1996.
22. Plaintiff's injury by accident on January 1, 1996, did not cause, aggravate, or accelerate her fibromyalgia and chronic fatigue syndrome. Plaintiff failed to establish by the greater weight of the evidence that fibromyalgia and chronic fatigue syndrome are the direct and natural result of her injury on January 1, 1996. Plaintiff experienced an aggravation of her pre-existing fibromyalgia and chronic fatigue syndrome from her repetitive and strenuous activities over long hours while working as a sonographer beginning in November 1996.
23. Plaintiff reached maximum medical improvement from her occupational injury on December 12, 1997, with a 10% permanent partial disability of the back. Plaintiff was released to return to work without restrictions on that date.
 * * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident on January 1, 1996. Plaintiff's January 1, 1996 injury by accident did not cause, aggravate or accelerate her fibromyalgia and chronic fatigue syndrome. Morrison v. BurlingtonIndustries, 304 N.C. 1, 282 S.E.2d 458 (1981). The evidence fails to establish that plaintiff's fibromyalgia and chronic fatigue syndrome proximately resulted from her injury by accident. The greater weight of the medical evidence establishes that plaintiff had pre-existing fibromyalgia and chronic fatigue syndrome, which were aggravated by her work as a sonographer after she left her employment with defendant-employer.
2. Plaintiff is not entitled to medical compensation for treatment of fibromyalgia and chronic fatigue syndrome, since such treatment is not necessary to effect a cure, give relief, or lessen disability from a condition causally related to plaintiff's occupational injury. Hyler v. GTE ProductsCo., 333 N.C. 258, 425 S.E.2d 498 (1993). The greater weight of the evidence fails to establish that the conditions for which plaintiff seeks medical compensation are causally related to her occupational injury.
3. Plaintiff reached maximum medical improvement on December 12, 1997, with a 10% permanent partial disability of the back. Plaintiff was released to return to work without restrictions on December 12, 1997, which rebuts the presumption of disability.Harrington v. Adams-Robinson Enterprises, 349 N.C. 218,504 S.E.2d 786 (1998); Stone v. G G Builders,346 N.C. 154, 484 S.E.2d 365 (1997). Plaintiff's temporary total disability related to her injury by accident ended on December 12, 1997, and defendant is entitled to a credit for all temporary total benefits paid after that date, as the same were not due and payable when made. N.C. Gen. Stat. § 97-42. The overpayment on plaintiff's temporary total disability is to be credited against the compensation due for permanent partial disability. Plaintiff is entitled to compensation for 30 weeks for her 10% permanent partial disability of the back. Since the 30 weeks compensation to which plaintiff is entitled for her 10% disability rating does not cover the overpayment made on temporary total disability, defendant is entitled to a continuing credit in the amount of such overpayment against any claim for future disability compensation.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for further disability and medical compensation under the Act must be, and the same hereby, is DENIED.
2. Defendant is entitled to a credit for temporary total disability benefits paid from December 12, 1997 to the date of this Award, reduced by 30 weeks compensation for benefits due for plaintiff's permanent partial disability rating. Defendant shall retain a credit for temporary total disability benefits paid in excess of 30 weeks to be assessed against any further claim plaintiff may make for disability compensation.
3. Defendant shall pay the costs of this proceeding, including expert witness fees previously approved by the Commission. Furthermore, an expert witness fee of $300.00 is hereby approved for John F. Babich, M. D. in connection with his deposition taken in this matter on December 4, 1998.
This 8th day of March 2000.
 /S_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ______________ CHRISTOPHER SCOTT COMMISSIONER
S/ ______________ DIANNE C. SELLERS COMMISSIONER